ARLEY B. MAGEE, Administrator of the Estate of WILBERT White, deceased,

*vs.*

LOUIS CHAMBERS, VICTOR WHITE, MADELINE CLEMENTS, and ELIZABETH FERGUSON, Administratrix of the Estate of Priscilla Taylor, deceased.

*Kent, Sept. 27, 1929.*

·˙ *Henry Ridgely*, for complainant.

*A. M. Whitaker* and *John F. Williams*, of Philadelphia, Pa., for defendant Clements.

*George M. Fisher, Jr.*, and *Arley B. Magee, Jr.*, for the remaining defendants.

THE CHANCELLOR. In view of the facts disclosed by the pleadings and the arguments made with respect thereto, it is to be assumed that the fund which the complainant has in hand for distribution is to be disposed of as the personal estate of Wilbert White in accordance with the Delaware statutes which govern in cases of intestacy. This observation renders it unnecessary to notice the terms of the policy, if it were before the court, or the pertinent Federal statute dealing with the subject.

The claimants are Louis Chambers, surviving husband of the natural mother of the deceased soldier; Victor White, a brother of the soldier's natural mother; the administratrix of a sister of the soldier's natural mother who survived her; and

Madeline Clements, an illegitimate daughter of the soldier's natural mother.

The question with which we have to do concerns the disposition of property belonging to the estate of a bastard. With respect to the estate of such a person the general statute (*Revised Code* 1915, § 3382) governing the subject of distribution of the personal estate of an intestate, has no application, except as to distributees who are his own legitimate lineal descendants. *Burris v. Burgett, et al.*, 16 *Del. Ch.* 10, 139 *A.* 454. Wilbert White had no such descendants, and therefore the general statute of distribution has no pertinency.

The Legislature of the State has however enacted certain laws which are designed to regulate the disposition of intestate estates where bastards are concerned in some at least of the various situations that might arise.

The first legislation on the subject was enacted in 1855 (11 *Del. Laws*, *c.* 243). By that act it was provided that when an illegitimate person dies intestate and without lawful issue, which is this case, his property, real and personal, should "pass and belong to the mother, if living, and in case of her death, to her lawful issue, share and share alike, subject always to the payment of debts," etc. In 1907 (24 *Del. Laws*, *c.* 224) the words "lawful issue share and share alike" were stricken out of the act of 1855 and the word "heirs" substituted. So that the act of 1855 as amended now reads as it appears in *Section* 3087 of the *Revised Code of* 1915. It is as follows:

"3087. *Section* 27. DESCENT FROM ILLEGITIMATE PERSON.—When an illegitimate born person dies intestate and without lawful issue, his property, real and personal, if any such there be, shall pass, and belong to the mother, if living, and in case of her death, to her heirs, subject always to the payment of debts and demands against such illegitimate person or persons, and to expenses of administration.

When Wilbert White died intestate and without issue, his mother had predeceased him. Under *Section* 3087, therefore his personal estate belonged to the mother's "heirs."

Who among the claimants answer to that description? That is the question which the case presents.

I think it clear in the first place that the mother's surviving

husband Louis Chambers, cannot in any sense be regarded as one of her heirs. This court has held that a surviving wife cannot be admitted to the category of ''next of kin'' of her deceased husband. *In re Smith's Estate*, 16 *Del. Ch.* 272, 145 *A.* 671. Neither also can the surviving husband or wife, in the absence of a special definition of the word, be regarded as an heir of his or her deceased spouse. *Mason v. Baily*, 6 *Del. Ch.* 129, 14 *A.* 309; 9 *R. C. L.* 50; 29 *C. J.* 301. The claim of Louis Chambers may therefore be dismissed from further notice.

This leaves three other possible claimants. They are Victor White and the administratrix of Priscilla Taylor and Madeline Clements. Victor White and Priscilla Taylor were lawful brother and sister of the intestate's mother. They would be her sole heirs if Madeline Clements is not. Madeline Clements is the only child but an illegitimate one of the intestate's mother, and is his own illegitimate sister. Can she qualify as the sole heir of her mother?

Certainly in the absence of any statutory provision she could not.

It is contended however by her solicitors that a statutory provision is found in this State by virtue of which she, being a sole child, is constituted the sole heir of her mother. The statute referred to was enacted in 1917 and is found in 29 *Delaware Laws, page* 740, *c.* 229. It introduces a new code section in the *Code* of 1915 and is as follows:

"3087A. *Section 27A.* DESCENT FROM THE MOTHER OF ILLEGITIMATE PERSONS.—When the mother of an illegitimate-born child dies intestate, her property, real and personal, if any there be, shall pass and belong in equal shares to such illegitimate-born child or children, and to the lawful issue of such who may have died, by right of representation.

"If there be no such issue, then said property shall go to the heirs at law of such deceased mother, subject always to the payment of her just debts and all lawful demands against her estate."

In 1919 (30 *Delaware Laws, p* 531, *c.* 200) the said section was amended so as to read as follows:

"3087A. *Section 27A.* DESCENT FROM MOTHER OF ILLEGITIMATE PERSONS.—When the Mother of an illegitimate child or children dies [intestate], such illegitimate child or children, or the issue of such who may be

dead, shall share in her real and personal estate, in the same manner as legitimate children or their issue."

The purpose of the act of 1919 was, as pointed out in *Burris v. Burgett, et al., supra*, doubtless to correct the absurdity which the literal language of the 1917 act created, viz., that under the latter, illegitimate children took their mother's estate to the entire exclusion of legitimate children.

The effect of the 1917 and the 1919 acts was not to completely legitimize illegitimate children. It made them legitimate for inheritance purposes only so far as the mother's property was concerned. *Burris v. Burgett, et al., supra.*

Any proper view of the 1919 statute must lead to this conclusion, viz., that it is meant, so far as the mother is concerned, to admit illegitimate children to the category of those entitled to take her intestate property as fully as legitimate children had theretofore been admitted. The statute does not in terms denominate those who are thus entitled to take her intestate property as "heirs." Indeed, nowhere do I find in the statute governing the distribution of intestate personal estates (*Revised Code* 1915, § 3382) any use of the word "heirs" as descriptive of those who are entitled to take. This of course is to be expected in a statute dealing with personalty for "heirs" is not a word of technical appropriateness in connection with personalty. But nowhere in the statute of descents (*Revised Code* 1915, § 3267) where the devolution of title to intestate real estate is regulated, do I find any use of the word "heirs" in association with those who are entitled to take. There is nowhere in our statutes a definition of the word "heirs." I take it therefore that the word when it is used in *Section* 3087 of the *Code* which governs the distribution of this intestate's estate and directs that, the intestate's mother being dead, it shall pass and belong to "her heirs," is to gather its meaning from the long accepted understanding which the common law from the earliest times down to the present has attributed to it. I do not of course mean by that statement that the individuals who may be heirs are to be determined by common law conceptions uninfluenced by subsequent statutory enactments. What is meant by the

statement is that there is an idea inherent in the word "heirs" which has been consistently recognized by the courts from time immemorial. That idea is that in the word "heirs" there is as there always has been the elementary idea of inheritance from another of his undisposed of property, to be exact of his real property. An heir is a person whom the law appoints to succeed to another's estate in case the owner has not disposed of it by will. *Mason v. Baily,* 6 *Del. Ch.* 129, 14 *A.* 309. At page 288 of 29 *C. J.,* various modes of expression of this idea may be found and the cases from which the expressions are taken are cited, from which it will readily appear that descent which is cast by the law upon the classes who are to take an intestate's estate is the most outstanding characteristic which the word "heirs" connotes. Our statute regulating the devolution of intestate realty, significantly and appropriately is described in the head note which precedes its appearance in the *Code (Section 3267)* as defining the "Rules of Descent." It is the commonly accepted view that those whom these rules point out constitute what we know as the "heirs" of an intestate decedent. The statutes of 1917 *(Code,* § 3087*A)* and of 1919 (30 *Del. Laws, c.* 200) are each preceded by a head note indicating that the subject matter dealt with by them is the devolution of property by descent, as in the general statute dealing with intestate real estate.

It seems clear therefore that a person's "heirs" are those upon whom the law, in the absence of testamentary provision, casts the descent of his real estate. If this be so, "her heirs" appearing in the act of 1917, when applied to this case, means that which the term usually indicates, viz., the persons upon whom, in case Alphonso Chambers died intestate, the law would cast title to her estate by way of descent and in succession to her.

Under the acts of 1917 and 1919, Madeline Clements would be a person taking from her mother by descent or inheritance and therefore to all intents and purposes an heir of her mother, though not specifically denominated as such. It is quite true that the act of 1917 provides that in default of illegitimate issue, the estate shall go to the mother's "heirs at law." From this it may be argued that the act of 1917 cannot therefore regard an illegitimate child as an heir. That argument however appears

to me not to be acceptable. It emphasizes unduly the mere use of a word and disregards totally the substance of things. In substance the act of 1917 means that title by descent, which is characteristic of heirship, shall pass first to an illegitimate child, and if not to the persons otherwise designated by law as entitled to take, those other persons being ordinarily called heirs at law. As is hereinafter indicated, it is my opinion that the true meaning of the act of 1917 is to be found in its rewritten form as it appears in the act of 1919. The rewritten form is such as to leave no room for the sort of argument just suggested. The act of 1917 was so loosely and carelessly drawn as to make it extremely doubtful whether any conclusions ought to be drawn from the mere technique of its phraseology.

It was very properly observed by this court in *Mason v. Baily, supra*, that the use of the word "heirs" which is a technical word of art appropriate to the law of real property, is inappropriately used to designate the devolution of title to personal property. Yet it does not follow that a testator may not, in describing those who are to take his personalty, designate them as the heirs of so and so. "Such use," said the Chancellor in that case, "is in respect to persons who are to take, and not in respect to property to be taken." The word is used as *"designata persona."* As "heirs" may be thus used by a testator in his will to designate the persons who are to take personalty, so it may be used by the Legislature in designating the persons who are to take under the intestacy statutes. It was so used by the Legislature in the statute embodied in *Revised Code* 1915, § 3087. This is so notwithstanding the property which is involved in this case was not the property of the mother, but the property of her illegitimate son. Her heirs take it not in right of their mother. If the right of their mother were the source of their claim, it would not be tenable. *Burris v. Burgett, et al., supra.* They take it by virtue of being the persons designated by the statute (*Revised Code* 1915, § 3087) to take the intestate property of Wilbert White.

Whether the term "heirs" as used in the statute must be defined solely in the light of the rules governing the descent of real property even though only personal property is involved,

it is not necessary in this case to consider, for it so happens that under the facts here shown the same persons who are the heirs of the real estate would also be distributees of the personal estate of Alphonso Chambers.

Inasmuch as those upon whom the right of succession to Alphonso Chambers' intestate estate is conferred by the law are in substance her heirs or distributees as the case may be, and inasmuch as the law designates those persons as the ones who shall take the intestate property of her illegitimate son, the next inquiry is—who are the heirs of Alphonso Chambers?

She died in 1909. As before stated her surviving husband is not an heir. Eliminating him, we have next to consider the remaining claimants. These are on the one hand a surviving brother and the representative of a deceased sister, and on the other a living illegitimate child. If we determine the membership of the class, "her heirs," as of the date of her death, it is apparent that her brother and the representative of her sister who survived her, are the only ones who can qualify as her heirs for in 1909 when she died the law was that an illegitimate child was not an heir even of its mother. The first statute making such child an heir was not passed until 1917. If we take the date of Wilbert White's death in 1918 as the period for the ascertainment of who would be the heirs of his mother for the purpose of discovering those entitled to his estate, it is then apparent that Madeline Clements is the only one who can qualify as her mother's heir. This is so for the reason that the act of 1917 passes the intestate estate of a mother to her illegitimate child or children, and if none to her heirs generally. In passing I may say, though not called upon to do so, that the act of 1917 should not be construed in its literal import so as to exclude legitimate children in favor of illegitimate ones as sharers in a deceased intestate mother's estate. The act should be construed so as to make it mean what the act of 1919 which amended it expressly states, viz., that illegitimate children shall share in the mother's intestate estate in the same manner as legitimate children. It is not necessary to pause to give my reasons for this view. That it is the correct one seems to me to admit of no doubt unless we are prepared to concede that the 1917 act was intended in

cases of illegitimacy to repeal and not dovetail into the general statutes of descent and distribution which admit legitimate children to the first rank as heirs—a concession which seems to me to be impossible of acceptance.

I recur to the question which at this stage of the discussion is the critical one—are we to look to 1909, the date of the mother's death, for the period when "her heirs" are to be ascertained, or to 1918, the date of Wilbert White's decease?

As bearing on this question, my attention has been called to the cases of *Wright v. Gooden*, 6 *Houst*, 397, and *Gray v. Corbit*, 4 *Del. Ch.* 357. These cases involved the construction of wills. In *Wright v. Gooden*, the devise was to four sons for life and no longer, and at their death to seven daughters for life and upon the death of the last surviving daughter to the testator's heirs forever. The court held that the heirs of the testator were to be ascertained as of the date of his own death rather than as of the death of the last surviving life tenant. In *Gray v. Corbit*, there was a devise of lands in trust to apply one-half the rents for support of the testator's son, Richard, for life. There was a surplus in the hands of the trustees at Richard's death which constituted a resulting trust in favor of the testator's heirs. It was held that the testator's heirs were determined as of his death and not as of the date of the death of Richard. On the strength of these cases it is suggested that the rule is that the identity of heirs is to be determined as of the date of the death of their ancestor.

These cases do not appeal to me as pertinent to the question we are now considering. Upon the death of Wilbert White intestate, the law immediately devolved title to his estate upon some one. Having no issue, the law said it should go to his mother, if then living, if not to her heirs. It was his and not his mother's estate that her heirs were to receive. It contemplated the possible existence in being of the mother at the time of the illegitimate's death. In that contingency she would be entitled to take; if otherwise, her heirs. It seems to me that it must mean that her heirs as they would then be were the ones intended, the result being just the same as it would be if the mother had barely survived the son and then immediately died intestate.

The question is not one of a conflict in periods of ascertainment of a testator's heirs as between the date of his own death and that of a life tenant or beneficiary under his will (the period of distribution) as in the cited cases. By force of the statute, "her heirs" are made the son's heirs so to speak. The general principle being that a man's heirs are ordinarily determined as of the date of his death (see the cases from 6 *Houston* and 4 *Del. Ch., supra;* also *Palmer v. Mitchell,* 117 *Ohio St.* 87, 153 *N. E.* 187, 55 *A. L. R.* 566), it would seem to follow that if by reference the heirs of another are arbitrarily made his distributees, we ought to refer to the date of his death when his estate is transmitted for the identification of those who as another's heirs are to succeed to his rights.

The laws of descent are operative in case there is no testamentary disposition. What are such laws except a direction ordered by the sovereign that an intestate's estate shall go to so and so? They express the terms of what has sometimes been called a "parliamentary will." See 9 *R. C. L. p.* 8. When they operate therefore it is as though the State made a will for the deceased, the terms of which are to be gathered from all the law regulating descent and distribution at the time the psuedo-will becomes operative.

Now if Wilbert White had himself left a will giving all of his estate to the heirs of his mother, thereby adopting the law of descent as the expression of his own testamentary wish, the heirs of his mother whom the law would regard as having been intended by him would be those persons answering that description at the time of his death when the will came into operation. Such view is in harmony with the result reached by Sir John Leach as Master of the Rolls in *Gittings v. McDermott,* 2 *Myl. & K.* 69, where the testator gave a residue in equal shares to each of his two sisters "and upon their deaths respectively to their heirs." The two sisters died in the lifetime of the testator. The Master of the Rolls was of the opinion that the gift did not lapse upon the death of the sisters in the lifetime of the testator, "but that it went to those who would have taken it by succession had the person to whom the life interest was given survived the testator." The report of this case does not clearly disclose

whether or not the time of the ascertainment of the sisters' heirs was referable to the date of the testator's death rather than to that of their own, and so the opinion of the Master of the Rolls as expressed in the foregoing sentence may be questioned as having been made without due consideration. In *Vaux v. Henderson*, 1 *Jac. & W.* 387, however, we have a direct ruling on the point from Sir William Grant, Master of the Rolls. In that case the testator gave a legacy to one Vaux and in case of his decease before the testator to his heirs. The legatee predeceased the testator. In the interval between the death of the legatee and the testator, a daughter of the legatee died leaving a husband and children. The Master of the Rolls decreed the legacy to the next of kin of the legatee living at the death of the testator. To the same effect is *In re Gaubra's Trusts*, 4 *K. & J.* 756.

On the authority of these two last cited cases, Mr. Hawkins at page 94 of his work on Wills states the rule to be as follows:

"If the substitutional bequest be to the heirs of A., a person who dies in the testator's lifetime, or who was dead at the date of the will, the persons to take are *prima facie* those who *at the testator's* death would have been entitled to the personal estate of A., by virtue of the statute, if he had then died intestate."

I repeat the observation before made which these authorities support, that if Wilbert White had himself left a will giving his estate to the heirs of his mother, those persons whom the law would point out as her heirs at the time of Wilbert's death would be entitled to the estate. And so when the Legislature by its intestacy laws provided that in the absence of testamentary provision by the deceased, the State's will should prevail in the disposition of his property, and the State's directions in that regard are phrased substantially as I have just imagined the possible will of the deceased to have been phrased—namely, to the heirs of his mother—I can see no reason why the same rule of ascertaining the identity of the heirs of the mother should not obtain. If so, the State in referring to "her heirs" in the act of 1907 meant the heirs to be those persons indicated by the statutes in force at the time the "parliamentary will" took effect, viz., at the time of the death of the intestate, rather than those

whom the State meant by the word at some prior stage in the course of its statutory expressions.

This view is not in conflict with *In re Smith's Estate*, 16 *Del. Ch.* 272, 145 *A.* 671, recently decided by this court. In that case, one of the questions was whether the identity of next of kin as substitutionary legatees was to be ascertained as of the death of their kinsman, the beneficiary first named, or at the date of distribution; and in answering that question the rule was adopted which the Chancellor approved in *In re Nelson's Estate*, 9 *Del. Ch.* 1, 74 *A.* 851, 860, viz., "Under a substitutional bequest to the 'heirs,' 'next of kin,' 'relatives,' etc., the persons to take are to be ascertained at the death of the persons whose 'heirs,' 'next of kin,' etc., are spoken of, and not at the period of distribution." The rule thus stated by the Chancellor in *Re Nelson's Estate*, *supra*, is a paraphrase of the language of Hawkins at page 95 of his work on Wills. Immediately following that language in Hawkins, there appears the rule just cited by me a moment ago as governing this case. It is to be assumed that the author does not regard the two rules as in conflict, for he makes no comment to that effect. I conceive the difference between the cases to which the two rules are applicable consists in this—that the one announced in *Nelson's Estate* and adopted in *Smith's Estate* is confined to substitutional bequests and embodies what courts conceive the intent of a testator to have been in designating beneficiaries whose identity is determinable on a future event; whereas the other one deals not with a future substitutional imposition at all, but with a disposition *in præsenti* when "heirs," "next of kin," etc., are ascertainable immediately upon the death of the testator and upon the will's taking effect. In the latter case the "heirs," etc., are the direct recipients of the testator's bounty and as they are known to him at the time of his will's taking effect it is to be assumed that he means to identify them as of that date. At all events such is the effect of the authority of Hawkins and the supporting cases cited by him. I have seen no authority to the contrary; neither does reason incline to the contrary. I accordingly feel impelled to apply the rule from Hawkins first above quoted as the correct one applicable to this case.

The conclusion is that inasmuch as Madeline Clements is the only person whom the law knows as the heir of the intestate's mother at the time of his death, the fund in hand should be paid to her.

This conclusion is in no sense a variance with the view expressed in *Burris v. Burgett, et al., supra*, to the effect that the statutes dealing with illegitimates do not operate to work a legitimation for all purposes. That case recognizes that partial legitimation is effected by the statutes and in this case we have but another instance where by force of statutory enactment the bar sinister of illegitimacy is removed for purposes of descent.

Decree accordingly.